**WASTE MANAGEMENT OF ALAMEDA COUNTY, INC., Plaintiff,**

v.

**EAST BAY REGIONAL PARK DISTRICT, Defendant.**

**No. C98–0433 TEH.**

United States District Court, N.D. California.

March 20, 2001.

1072

Richard A. Holderness, Mitchell H. Segal, Seyfarth Shaw, San Francisco, CA, Patricia B. Walker, John D. Fognani, Jonathan M. Fingeret, Zevnik Horton Guibord McGovern Palmer & Fognani, Denver, CO, Clark J. Davis, Brown Davis & Roberts, Gig Harbor, WA, Jeffrey S. Raskin, Zevnik Horton Palmer LLP, San Francisco, CA, for plaintiff.

Ted C. Radosevich, East Bay Regional Park District, Oakland, CA, Barry S. Sandals, Brooks M. Beard, Morrison & Foerster LLP, San Francisco, CA, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT

HENDERSON, District Judge.

The focus of this action is Oyster Bay Regional Park which comprises 194 acres of property fronting the San Francisco Bay in San Leandro, California. Originally used as a municipal landfill for 38 years, the site was covered and transferred to the East Bay Regional Park District ("Park District") for development into a shoreline park. Thereafter, the property became contaminated with leachate, a hazardous waste that develops when water interacts with waste. The amount of leachate at the landfill has, and will continue to, require substantial remedial efforts, which to date, have been largely borne by plaintiff, Waste Management of Alameda County, Inc. ("WMAC"), the prior owner of the site.

In 1998, WMAC brought this action against the Park District for contribution and declaratory relief pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), as amended, 42 U.S.C. §§ 9607, 9613, the analogous California Hazardous Substance Account Act ("HSAA"), Cal. Health & Safety Code §§ 25300 et seq., and the Declaratory Relief Act, 28 U.S.C. §§ 2201, 2202. The complaint also asserted a variety of state law claims that were dismissed without prejudice on April 24, 1998. In response, the Park District filed a counterclaim under CERCLA, HSAA, and the Declaratory Relief Act seeking comparable relief.

The action was tried before the Court between November 30, 1999 and January 14, 2000. Both parties contend that the evidence demonstrates that the other should be held primarily or entirely responsible for the cost of remedying the leachate contamination at the site. The parties also dispute the recoverability of costs already incurred and whether WMAC's remedial action plan for leachate control is necessary and consistent with the National Contingency Plan. Having carefully considered the testimony presented, along with the voluminous evidentiary record, and the comprehensive post-trial briefs and other submissions, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### I.

### BACKGROUND FACTS

A. *Developments Leading Up to Transfer of the Landfill to the East Bay Regional Park District*

Beginning in 1942, WMAC's predecessor—Oakland Scavenger Company ("OSC")—operated a 247–acre landfill at the western end of Davis Street in San Leandro, California, known as the Davis Street Landfill ("the Landfill"). The property lies on the eastern side of San Francisco Bay, approximately ¾ mile southeast

of the Oakland International Airport. Most of the site is reclaimed tidal flat lands. Starting in 1949, the original landfill area was expanded by construction of a perimeter levee. The area enclosed by the levee was dewatered, and waste was placed directly on the tidal mud flats.

During its 38 years of operation—until 1980—OSC disposed of approximately 13 million cubic yards of waste at the site, weighing approximately 6 million tons. OSC acquired the waste by providing garbage collection services for approximately 75 % of the residential and commercial population of Alameda County, California, through franchise agreements. Some industrial wastes are also deposited at the site. In 1986, WMAC acquired OSC, valued at the time at $85,400,000, and assumed all of its liabilities, including all liabilities associated with the former Davis Street Landfill.

For the years the Landfill was operational, OSC was required to obtain a use permit from the City of San Leandro ("San Leandro"). In 1970, OSC was advised that there was enough volume left in the Landfill to make it usable for another 10 to 15 years, assuming operational permits were granted. The estimate, however, was later substantially revised when the pace of dumping exceeded expectations. By the mid–70's, OSC knew the Landfill would soon reach capacity, but OSC had no ready alternative location near the Davis Street site. Instead OSC hoped to address this looming concern by building a Transfer Station on the 53 eastern acres of the site. This Station would allow OSC to crush and compact the garbage collected on local routes for transfer to the more distant Altamont landfill, thus saving the "heavy expense" of a longer direct haul of the garbage, see Def.'s Exh. 131 at 5419, with its substantially higher transportation, labor, and other costs.

This plan, however, was contingent upon San Leandro agreeing to (1) re-zone the 53 acres, (2) grant a use permit for the Transfer Station, and (3) extend OSC's permit beyond its then expiration-date of 1976 so that it could continue dumping at the Landfill until the Transfer Station was operational.

At the same time, both OSC and San Leandro were aware that the residents of Mulford Gardens, a development just southeast of the site, were strongly opposed to the continued operation of the Landfill because of its odors, attraction of flies, and similar nuisances. The residents argued that the best use of the land would be for recreational purposes, emphasizing that "[h]istory shows that San Leandro's long-range development plans call for a park on that site." Def.'s Exh. 76 at 18381. OSC also knew that San Leandro was considering not extending OSC's permit, thus putting OSC in a "survival mode" according to OSC's then board member, Ronald Proto. Tr. 1654.

In mid–1976, the City of San Leandro proposed that OSC turn over 194 acres of the Landfill to the Park District for development into a shoreline park. OSC understood that such a donation was a prerequisite to San Leandro favorably viewing its plans for the Transfer Station, although the two were never officially linked. As OSC plainly acknowledged in correspondence to the Regional Water Quality Control Board ("Water Board"), "The San Leandro City Council has required, as a condition to granting a Use Permit for the Transfer Station, that Oakland Scavenger Company dedicate the 194–acre parcel for park purposes to East Bay Regional Park District, or some other park agency." Def's Exh. 131 at 5418; see also Proto Tr. 1652–53 (San Leandro "condition[ed]" permission to build Transfer Station upon donation of 194 acres).

OSC also understood that, in return, San Leandro would extend OSC's permit to dump at the Landfill beyond 1976, which would alleviate its immediate dilemma. At the same time, OSC's commercial options for the landfill were limited, particularly given the permitting requirements enforced by the Bay Conservation and Development Commission.

Given OSC's predicament and the Park District's interest in making more shoreline publicly accessible, both agreed to pursue San Leandro's proposal, and the two parties jointly submitted, on July 28, 1976, a proposed letter of intent to this effect to San Leandro. The letter stated *inter alia* that the parties had agreed that OSC would be permitted to use solid waste as fill material to meet surface drainage and contour conditions as might be required by the Water Board and that OSC would cover the site with cover materials consistent with Water Board requirements. Additional fill would also be used to build up contours needed to make the site desirable as a park. As a result of the letter of intent, San Leandro granted OSC multiple permit extensions, enabling it to continue dumping garbage at the Landfill for over four additional years, from September 1976 until December 1980. Nearby residents reluctantly agreed not to oppose the permit extensions with the understanding that the property would ultimately be developed into a park by the Park District. OSC also obtained a use permit for the Transfer Station which continues in operation to this day.

After lengthy negotiations, the Park District and OSC entered into an Option Agreement in April 1979, which provided the framework for transferring ownership of 194 acres of the Landfill to the Park District in three phases over a ten year period. *See* Pl's Exh. B–1 ("Agreement"). The first phase would transfer Parcels 1 and 1–A, consisting of the outer perimeter of the Site (approximately 67 acres), and the southeast portion of the Site (approximately 21 acres); the second phase would transfer Parcels II and II–A, consisting of the southern, internal portion of the Site (approximately 65.5 acres) and a small area for a service yard on the northern, internal portion of the Site (approximately 2.5 acres); and the final phase would transfer Parcel III, consisting of the northern, internal portion of the Site (approximately 37.4 acres). The Park District was not required to pay OSC any financial consideration for the property. *See* Agreement ¶ 2.8(a).

The Agreement further provided that OSC would take the necessary measures to cover up and "close" each of these parcels, consistent with requirements of the Water Board. *See* Agreement ¶ 2.3 ("OSC shall provide ... the 'cover materials' required by 'the Closure Plan and in the site closure plan finally approved by the Water Board ....'"). The transfer of the parcels was to follow OSC's completion of these closure obligations. *See* Agreement ¶ 2.8. The Agreement further provided that if the Park District elected to not exercise its right to acquire any of the parcels, ownership of the entire Site would transfer to San Leandro, and if not accepted by the City, would revert to OSC. *See* Agreement ¶ 2.8(c). The Park District, however, exercised its option to accept ownership of all three parcels. It assumed ownership of parcel 1 in December 1982 and May 1983, Parcel 2 in August 1985, and parcel 3 in July 1990.

Leachate is a hazardous waste liquid that is formed when water infiltrates into, and interacts with, the solid and liquid

waste in a landfill.[1] Thus, the purpose of "closing" a landfill is to provide a barrier between the waste and any water with which it might come into contact. While refuse itself has a large capacity to hold water before generating leachate, the risk of developing leachate is common in municipal landfills. In this case, the immediate proximity of the San Francisco Bay made the need for proper containment of leachate particularly critical.

Both parties were aware, during negotiations of the Agreement, that there was a risk of leachate problems developing at the site, notwithstanding the "closure" process contemplated by the Agreement. Both sides, however, refused to accept contractual responsibility for long term environmental risks. Instead, the parties dodged the issue, and essentially left it to the Water Board—which had not yet approved a closure plan at the time the Agreement was signed—to approve an appropriate closure plan and utilize its enforcement powers as it saw fit.[2] As detailed more fully below, the parties' concerns regarding the risk of contamination were well founded, as leachate problems began to unfold by the mid–1980s.[3]

### B. OSC's Closure Plan for the Landfill

As noted above, OSC agreed to develop and implement a closure plan at the site. At the time, such closures were governed by Water Board Resolution No. 77–7, which provided "minimum criteria" for proper "closure" of landfills, including a 3% slope requirement as well as the following standards:

1. All completed disposal areas shall be compacted and provided with a final cover of at least three feet of clean soil. A lesser thickness of final cover may be allowed upon a demonstration that, due to thorough compaction of refuse or other factors, differential settlement is likely to be minimal. At least one foot of the final cover shall be compacted to attain a permeability no greater than $10^{-6}$ cm/sec. Exceptions to this requirement may be granted upon a demonstration that equivalent protection against

---

1. Leachate is primarily comprised of water, dissolved organics, ammonia, dissolved, salts, suspended solids, dissolved metals, and trace amounts of various volatile and semi-volatile organic chemicals.

2. For example, the agenda for the June 21, 1977 Park District board meeting discussed the proposed park plan and detailed the Water Board's preliminary recommended requirements which included "A leachate containment system [that] shall be constructed to prevent discharge from the disposal site to the surrounding surface and groundwater bodies." The Agenda's author went on to comment "I recite this to show you the importance of the requirements by Water Quality Control and to show you that we are in good hands here. As you know . . . we are governed by their requirements at this site, as is Oakland Scavenger Company." Pl's Exh. C–4 at 16131. See also Pl's Exh. B–2 at 6664 (April 17, 1979 Park District resolution approving the Agreement stating in part that "acquisition of the Site by the District subject to . . . [c]losure of the land fill operation on the Site in accordance with all applicable requirements of the City of San Leandro, Regional Water Quality Control Board, and other public agencies having jurisdiction").

3. The only significant source of the chemical constituents found in leachate at the site is the solid and liquid waste that was deposited there during OSC's operation of the landfill. Indeed, the leachate chemistry at the site is typical of mature solid waste facilities found throughout the United States. "Despite variations among the different leachates analyzed, these parameters appear to be routinely present in most municipal solid waste landfills and appear to represent 'typical' leachate characteristics." See Joint Trial Ex. 1, Vol. I, at P000006 and P000087; Def.'s Exh. 328 at PD002471.

water penetration may be provided by other means.

\* \* \* \* \* \*

4. All necessary facilities shall be provided to ensure that leachate from group 2 waste and ponded water containing leachate or in contact with refuse is not discharged to surface waters of the State.

Def's. Exh.105 (emphasis added). As OSC's site closure consultant, Richard Karn made clear, "I'm sure that [OSC][was] aware of [these requirements]." Tr. 1324. OSC also agreed to implement one of two additional "Closure Plans" (denominated Plan "A" or "B") that were designed solely for the purpose of creating a rolling topography for the park. *See* Agreement ¶¶ 2.3, 3.

On August 12, 1977, OSC submitted to the Water Board its proposed closure plan for the Site. In accordance with Resolution No. 77–7, the draft called for a three foot soil "cap" or "cover" which included a layer of compacted soil with a very low-permeability of 10$^{-6}$ (commonly referred to as a clay cap or lining) to be topped by 12–30 inches of non-compacted, permeable soil that would provide the basic planting area for the park development. OSC also proposed to build 13 leachate monitoring wells at various locations around the Site. The proposal further noted that there was no evidence at that time of any leachate leaking. "Since the landfill is constructed on very tight Bay muds, there has been no evidence of leachate seeping into useable ground water basins beneath the site." Pl.'s Exh. C–7 at 3630.

On December 6, 1977, the same date the Park District formally endorsed this plan, OSC wrote to the Park District informing it that OSC was now proposing an alternative "water balance" method of closure. "[T]hereafter, [OSC] refused to seriously consider again the impermeable barrier plan that the [Park District] board had approved." Black Tr. 1837.

Instead of relying on an impermeable clay layer to prevent water from infiltrating into the landfill, the water balance method depends on the absorptive capacity of the soil used to cover the landfill to soak up rain and moisture and prevent leachate from building up and leaking out. As OSC explained in its revised closure proposal:

For a specific type and thickness of soil, a specific storage capacity can be determined. When that capacity is exceeded, water will percolate into the refuse beneath the earth cover. In the dry months, evapotranspiration will exceed the precipitation and water will be withdrawn from the soil. The ideal situation exists when the amount of soil cover is sufficient to store the maximum amount of precipitation without allowing percolation [of rain] into the refuse.

Def.'s Exh. 122 at 15208. OSC learned of the water balance approach, through its consultants, from a 1975 EPA publication entitled "Use of the Water Balance Method for Predicting Leachate Generation from Solid Waste Disposal Sites." OSC knew that this method was then new and largely untested in the field. And while OSC's consultants, Bissell & Karn, told OSC that this new approach looked logical, they never guaranteed to OSC that their particular water balance proposal would work. Nor did they have any prior experience with this approach.

WMAC suggests that OSC's decision to switch from a clay cap to a water balance approach was motived solely by a desire to accommodate the Park District's planting needs. Read fairly as a whole, however, the record reflects only that the Park District wanted to make sure that, if a clay cap was used, that sufficient top soil be available for planting as needed. WMAC's

alleged motive is further belied by the fact that while the Park District approved OSC's original clay cap plan, it never approved the water balance plan. Indeed, based on its own review, the Park District's concerns were so serious that the two parties were "at absolute loggerheads about that, the change in the proposal for the cover." Black Tr. 1838.[4] While the Park District ultimately agreed to go forward, it never endorsed the water balance method and instead agreed to simply stay "neutral," with the expectation that the Water Board would adequately handle all issues relating to the closure.[5] Given the above, WMAC's explanation for its cover choice is simply not credible. Rather, while the evidence is indirect, the Court concludes that OSC's decision to pursue the water balance plan was driven more by its cheaper price tag rather than a desire to accommodate the Park District.

On October 17, 1978, the Water Board issued its first order relating to closure of the site, No. 78–84. The Order, directed to OSC, stated in part that "The discharger shall submit a site closure plan to the Board which shall conform to Resolution No. 77–7 ..." Def.'s Exh. 137 at 7564. The Order further reiterated that "leachate from Group 2 wastes and ponded water containing leachate or in contact with refuse shall not be discharged to waters of the State." Def.'s Exh. 137 at 7563.

Shortly thereafter, on January 31, 1979, OSC submitted its revised closure plan to the Water Board based on the water balance method. Since this method violated the specific requirements of Resolution 77–7, given the absence of a low-permeability $(10^{-6})$ cap, OSC relied on the provision that "[e]xceptions to [the requirements] may be granted upon a demonstration that equivalent protection against water penetration may be provided by other means." Def.'s Exh. 105 at 180.

OSC's proposal called for 3 feet of cover (consisting of 6 inches of "daily cover placed during daily operations, topped with 2 feet–6 inches of soil wheel-rolled for compaction"). Assuming the use of sandy or silty loam soils, the proposal represented that "[t]he basic three feet of cover has been determined to be adequate to prevent the infiltration of excessive rainfall and the build-up of leachate in accordance with the water balance method." Def.'s Exh. 146 at 1144. The proposal also anticipated that the Park District would place additional fill in certain areas to accommodate park planting needs. OSC's representation regarding the adequacy of their plan assumed both a 3 percent slope (to promote runoff), and *average* rainfall at the site. Notably, however, the EPA publication

---

4. A report by the Park District's geotechnical consultants raised a number of concerns with the specifications of OSC's revised plan, including concerns regarding soil variability and quality, the reliance on average rainfall measures, settlement of soil, and other issues. Specifically, the report noted that "The cover material thickness proposal is essentially the same as [prior submittals]. The thickness is based on a theoretical water balance method of analysis which does not adequately answer the questions of soil variability, above-average rainfall, and cracking due to differential settlements. Material quality to date has been highly variable as demonstrated by the O.S.C. test results." Def.'s Exh. 158 at 4027.

5. *See* Agreement ¶ 3.7 ("OSC shall be solely responsible for processing and obtaining all approvals for closure of the Site, including approval of the Water Board. Park District shall not participate or enter into such proceedings. OSC shall not represent to or knowingly permit the Water Board to believe that the Park District prefers, recommends or supports any particular closure specifications or procedure, or that the Park District takes anything other than a neutral position with respect to the decisions of the Water Board.").

that discussed the water balance approach warned that reliance on average rainfall may be risky:

> [W]hile the average year might indicate a relatively minor leachate problem requiring little or no leachate control measures, an above average year may result in an entirely different assessment of the problem. Therefore, the engineer may wish to base his design on monthly precipitation values higher than the average values in order to provide a factor of safety in the estimation of leachate flow.

Def.'s Exh. 71 at 23. OSC, through its consultants, Bissell and Karn, suggested to the Water Board, however, that using average rainfall data in this instance would not be risky, despite the fact that the San Francisco Bay Area periodically experiences intensely rainy years, commonly referred to as "El Nino" years.[6] Thus, its proposal to the Board stated only that:

> Naturally . . . climatic factors vary each year so it was decided to design the landfill cover to meet the average conditions as specified by the [Water Board] staff. In the event that more precipitation occurs, some small amount of water may percolate into the refuse. However, the refuse itself has a large capacity to hold water before generating leachate. The intent of this design is to prevent the increase in the amount of leachate already in existence in the landfill.

Def.'s Exh. 146 at 1152.

On August 5, 1980, the Water Board issued Order 80–37, amending but not replacing Order No. 78–84. That order found that OSC's closure plan did not conform to Resolution 77–7, as required, because it "[did] not call for an impermeable

cover . . ." Def.'s Exh. 178 at 3697. The Water Board concluded, however, that OSC could "mitigat[e]" this non-compliance "with the installation of a leachate monitoring and collection system." Def.'s Exh. 178 at 3697. Accordingly, the Water Board ordered OSC to "install a leachate monitoring and collecting system in accordance with plans contained in the Closure Plan Supplement of June and July 1980." Def.'s Exh. 178 at 3698. The 1980 Order also stated that with respect to non-drip irrigation, OSC must, at least 120 days prior to the start of irrigation, submit a report evaluating the available leachate monitoring well data. "This report should address the need for additional leachate monitoring wells." Finally, the Order required that OSC "complete site closure" by December 1, 1981. Def.'s Exh. 178 at 3698.

OSC's plan for mitigating the lack of an impermeable cover for the site—referred to above as the "Closure Plan Supplement"—consisted of two letters, dated June 6, 1980 and July 11, 1980, that had been submitted in response to specific Water Board concerns that the non-drip irrigation needs of the Park would require additional precautionary measures. However, as Karn testified at trial, he knew that leachate buildup was a possibility even in the absence of any special Park District irrigation and that was why he developed the supplemental system, "that, and that [ ] of course, was the concern of the [Water Board] also. So for those reasons we put in the monitoring system [into the proposal] . . . [in case] anything went wrong." Tr. 1350–51. In short, Karn explained, if the water balance calculations

---

6. The average rainfall figure used by OSC was 17.68 inches (based on rainfall at the nearby Oakland International Airport). Just six years earlier, in 1973, however, the rainfall at the Oakland Airport was 29.37 inches.

proved wrong, one of the backup solutions would be a leachate control system.[7]

In its mitigation plan, OSC represented that it had chosen to "build[ ] a leachate collection and disposal system" which would consist of additional wells placed at 1,000 foot intervals that would be "used for *pumping purposes* as well as monitoring." Pl.'s Exh. C–17 at 3684 (emphasis added). While OSC did not explicitly discuss the method of disposal of any pumped leachate, it attached a rough illustration that showed, along with locations for the proposed seven new wells, two bold lines that appear to be pipelines that would allow excess leachate to be pumped out of the site. The notations on the drawing state "possible discharge to sanitary system in Neptune Drive" and "Possible portable pump discharge line to sanitary system in Davis Street." Pl.'s Exh C–17 at 3686. As Karn explained, "I think that probably what we were showing or what was attempted to be shown here was a method of disposing of the leachate. Yes, because it's going to a sanitary sewer system." Tr. 1350.

The mitigation plan was somewhat vague on when pumping would commence. Karns testified, however, that he had advised OSC that "leachate collection should begin" once leachate reached 8 feet mean sea level ("MSL"). Tr. 1354, and that OSC "accepted" this suggestion "as a general matter." Tr. 1356. This is consistent with the mitigation plan's assertion that the existing dike has "a safe containment elevation of 8 feet MSL." Pl.'s Exh. C–17 at 3685. A 1988 OSC internal memo interpreted the closure plan slightly differently—as requiring implementation of "leachate control (i.e. evacuation) if leachate levels in the site's leachate wells exceed 7.5 feet MSL." Def.'s Exh. 257 at 43769. In any event, at trial Karns eventually confirmed, despite his often evasive testimony, that he had advised OSC that it was "their responsibility ... [ ] to protect the waters of the state," and that "the closure plan would have to provide for leachate pumping if monitoring showed that was necessary," and "leachate disposal if monitoring showed that was necessary." Tr. 1351–52. In short, "if the water balance was wrong, and leachate built up" OSC would have "to take care of it." Karns Tr. 1351. Indeed such understanding was fully consistent with the Water Board's 1978 order to OSC that "Leachate from Group 2 wastes and ponded water containing leachate or in contact with refuse shall not be discharged to waters of the State." Def.'s Exh. 137 at 7563.

The mitigation plan originally stated that OSC would design the leachate control system immediately but construct it "when and if the leachate level reaches an elevation of +7.5 feet MSL." Pl.'s Exh. C–17 at 3685 (June 6, 1980 letter). In its subsequent July 11, 1980 letter, however, OSC stated that it would install the monitoring and pumping wells "prior to December 31, 1980" without any reference to mean sea levels. Pl.'s Exh. C–19. In any event, the mitigation plan clearly represented that the monitoring and pumping wells would be installed in time to "be used to monitor the leachate level in the landfill and to assure that it did not reach elevations which would cause overtopping of the surrounding levee." Pl.'s Exh. C–19 at 3693.

---

**7.** *See* Karn Tr. 1349 "(Q: And did you also determine that any concern about using average rainfall instead of maximum rainfall could be allayed by a leachate control system to dispose of leachate if it got out of control? A: That's always the backup system, yes. Q: And so the leachate control system was the backup that you were proposing in case the water balance calculation was wrong, is that right? Yes or no. A: It was one of—one of the possible ones, yes. Q: It was one of what? A: One of the solutions would be a leachate control system").

### C. *Implementation of the Cover Requirements*

OSC covered the site between 1980 and 1983, using 1 million cubic yards of soil of varying types. Given that the water balance approach relies on the moisture storage capacity of the soil, use of soil that contains the required absorptive properties is essential. As Karn acknowledged, "You had to put the right soil on." Karn Tr. 1316.

As WMAC emphasizes, Lewis Crutcher, Chief of Planning and Design at the Park District, who came out to the site "probably once a week," Bickford Tr. 1417, reported that OSC has "done a remarkable job in engineering their garbage into the contours of the District's plan and that the cover material being put on by [one source] Gallagher & Burk is the overburden from a quarry and is beautiful cover material." Pl.'s Exh. C–24 at 22939. On the other hand, the evidence shows that not all of the soil—which was brought in by dozens of truckloads each hour—was the high moisture capacity silty or sandy loam. A detailed analysis of the site commissioned by WMAC in 1996 found that the "soil materials that constitute the landfill cover are highly variable" and consist of, in addition to clays and silty sand and loam, the more porous "gravelly sand, and sandy gravel." Jt. Exh. 1 at 104 ("Rust Report"). Consistent with this finding, the Rust report also noted that "[r]ecovery [of samples] was variable due to coarse gravels and occasional cobbles in the landfill cover material which damaged the thin walled Shelby tubes, thus hampering recovery." Jt. Exh. 1 at 614–15.

Anecdotal evidence also indicates variability in the quality of the cover. Ralph Bickford, an OSC consultant, recalled that OSC employees told him that there were rocks in some of the material and that

some of the soil "wasn't as good as they expected." Tr. 1408; *see also id.* at 1422 ("I would say it included rock[s]."). Crutcher had also previously noted that some of the material OSC had stockpiled for the cover "is observed to be filled with sharp rocks, some quite large and questionable for use …." Def.'s Exh. 109 at 18589. A photogrammetry analysis of a 1983 aerial photograph of the site also shows that 52 acres, or roughly 25 percent of the site, did not meet the 3% percent slope requirement set forth in OSC's closure plan.

Water Board representatives inspected the site on July 27, 1981, January 7, 1983, and January 30, 1984 and reported no problems. In December 1983, OSC notified the Water Board that it had completed construction of the seven new leachate wells and asked for final approval of the closure. In June 1984, the Water Board notified OSC, that based on letters submitted by Bissell and Karn, and a site inspection, it had determined that compliance with closure requirements had been achieved. The Water Board's decision does not appear to consider the fact that while OSC had installed seven wells that could be used for pumping, without any conveyance structures they were pumps with no place to go, and thus the site still lacked any system for collecting or otherwise disposing of excess leachate.

Since 1983, when OSC finished covering the site, the Park District has developed 10 acres of parcel II into a park, that includes trails and picnic areas, along with a perimeter, shore-line trail along nine acres of parcel I.

### D. *The Development of Leachate Contamination and the Parties' Responses*

*(1) 1983—November 1994*

In 1983 and 1984, Northern California experienced extended, heavy winter

storms, referred to as El Nino, and the first signs of a developing leachate problem surfaced shortly thereafter. OSC's annual self-monitoring report for the 12–month period ending March 1984 showed leachate levels in one well exceeded 8.0 MSL on May 3, 1983 and another exceeded 7.5 MSL on November 22, 1983. This was a significant departure from the previous "static" leachate levels of "about 6 feet MSL." Pl.'s Exh. C–17 at 3685. In June 1984, the Water Board found that OSC had satisfied its cover requirements. Leachate levels, however, continued to fluctuate above 7.5 MSL.

Prodded by the Park District, the Water Board eventually wrote OSC in April 1986 that it was "concern[ed] regarding the fluctuating leachate levels at the site." Def.'s Exh. 214 at 5480. The Water Board further stated:

> The closure plan indicates that the containment barriers have a top elevation of 10 feet MSL and a containment elevation of 8 feet MSL. Additionally, a leachate control system was planned to be implemented if the leachate levels exceeded 7.5 feet MSL. However, our files do not contain the as-built drawings of the leachate containment barrier and there has been no indication that Oakland Scavenger has ever initiated the leachate control system even though the leachate levels have exceeded the 7.5 feet.

Def.'s Exh. 214 at 5480. The Water Board requested that OSC respond with, *inter alia*, its plans for reducing leachate levels.

In its May 27, 1986 response to the Water Board, OSC conceded that "[s]everal of the twelve leachate monitoring wells on the perimeter of the Davis Street Landfill show high levels of leachate." Def.'s Exh. 216 at 3718. It also acknowledged that northern portions of the dike were not in fact 10 feet MSL as represented to the

Water Board in 1980, but rather 8.3 feet. It also reported that a Park District project to repair El Nino related damage caused in 1983–84 had brought the southern end of the dike up to 12 feet MSL. Def.'s Exh. 216 at 3719.

OSC asserted that it had installed the "leachate control system" and reaffirmed its obligation to pumping but explained that "[t]here was no specific commitment to begin pumping when the leachate level reached the 7.5 ft. level. In our understanding pumping was to begin if overflow appeared imminent." Def.'s 216 at 3723. It further noted that it had begun experimental pumping of one well with the leachate pumpings being sprayed on the landfill cover surface for evaporation. In fact, however, there was still no "leachate control system" in place that would allow for the collection of leachate, once pumped from the wells. Nonetheless, OSC assured the Water Board that:

> Should these pumping tests indicate that there is a leachate buildup, which requires a larger volume pumping effort, we will procure the necessary equipment and pump as is necessary to reduce the leachate level. The leachate would be placed in a temporary evaporation pond to be constructed on the landfill, or arrangements would be made with the San Leandro Sewage Treatment Plan to accept it either by tank truck load or by pipeline....
>
> I trust the above will reassure you that we are conducting post-closure affairs at the Davis Street Site in a responsible manner.

Def.'s Exh. 216 at 3724.

Accepting these assurances, the Water Board took no action. Later that year, however, on November 5, 1986, the Water Board again expressed concerns regarding continuing variations in the leachate levels,

and particularly the leachate levels over 9.0 in Well Gr–5, despite pumping of several days at that well. The Water Board also stated that due to approaching wet weather, OSC should consider leachate disposal off site instead of spray disposal. Def.'s Exh. 232 at 6404–05. It also required OSC to install additional leachate monitoring wells in the interior of the site by January 1, 1987, and increase its monitoring reports from quarterly to monthly.

In December 1986, WMAC acquired OSC and its liabilities, including any outstanding liabilities concerning the Davis Landfill. On December 29, 1986, OSC reported again to the Water Board, that, *inter alia*, it was still "trying to establish a policy" to cover disposal of leachate and again repeated that "[I]f we dispose of leachate off site, we would prefer to do it at the San Leandro facility, which is just across the street." Pl.'s Exh. F–12 at 7502.

A year later, in October 1987, the Water Board again raised concerns about leachate levels, noting that the monitoring data showed a "buildup of leachate within the landfill since the closure of the site." Pl.'s Exh. F–20 at 17264. It found two threatened violations of its prior orders (regarding the need to regrade the slope in certain areas and the stockpiling of rubble) and asked OSC to submit a proposed corrective action plan, which it did.[8] The Water Board also reiterated that OSC should install interior monitoring wells. Pl's Exh. F–20 at 17265.

In November 1987, the following month, OSC met with Water Board staff Ken Theisen who expressed "doubts about the adequacy of the cover," the integrity of the perimeter levee, and the work done by

Bissell & Karn. Def.'s Exh. 244 at 17242–43; *see also* Def.'s Exh. 245 at 5489 (December 1987 letter noting that "[t]he [Water Board] staff is still concerned about the adequacy of the landfill cover and the fluctuations of leachate elevations within the landfill"). About this time, Mike Crosetti, the OSC employee with overall responsibility for the landfill, also reported to WMAC that the northern perimeter of the dike was in "a debatable state of repair." Def.'s Exh. 246 at 42851. He also observed that "[t]here was little evidence of surface runoff throughout the site despite decent existing grading. Reason seems to suggest that the landfill cover, at least in parts, is ineffective in preventing rainfall intrusion." Def.'s Exh. 246 at 42852.

At the November 1987 meeting, OSC told Theisen it had reached an agreement for the San Leandro Sanitation District to accept leachate from the landfill, information which was "well received" by Theisen. Def.'s Exh. 244 at 17243. OSC also reported that the tenor of the meeting was positive, and that Theisen was happy with progress at the site and assured OSC that it did not intend to take enforcement action so long as work proceeded in "an appropriate fashion." Def.'s Exh. 244 at 17243. OSC did not, however, finalize the plan to dispose of leachate at the San Leandro treatment plant, despite the "low discharge fees" San Leandro was offering at the time. Def.'s Exh. 257 at 43770.

In June 1988, WMAC filed its Solid Waste Assessment Test (SWAT) Report, as required by state law, which recommended some additional investigation and analysis with respect to possible groundwater contamination. Def.'s Exh 254 at 4572. No such analysis was undertaken at

---

8. WMAC contracted to have the re-grading work done. With respect to the construction rubble, OSC explained that it was being stockpiled by the Park District for use in repair of

the northern side of the dike and that it did not "appear to present an erosion problem." Pl.'s Exh F–21 at 901.

the time, however. In 1988, OSC did install six additional monitoring wells in the interior of the site, as first requested by the Wate: Board in 1986. It was later discovered, however, that the wells had been improperly installed, creating new pathways for groundwater contamination.

In July 1988, an internal OSC memo discussed the fact that leachate levels had been reported "as high as 9 feet," which was well beyond the 8 foot trigger Karn had advised for pumping. Def.'s Exh. 257 at 43769. OSC did not, however, accelerate its efforts to start pumping or establish a leachate collection system. Instead, the memo goes on to note that while OSC had reported to the Water Board that "we were pursuing an agreement with the San Leandro POTW," a 1987 personnel change at the Water Board had "left [the issue] hanging." Def.'s Exh. 257 at 43769. The memo then discussed the costs involved in pursuing various options, including discharge at the San Leandro POTW. It concluded, however, that "we may never need to evacuate liquids" and noted that the Park District had raised the height of part of the levee and intended to raise the height of the remainder in the future. The only action recommended was quarterly sampling for the six wells exhibiting the highest leachate levels, although it warned that "[o]ver the long term, it may well behoove us to consider the installation of a tank and a pretreatment system. I believe that future legislation will require landfill liquids extraction and treatment." Def's Exh. 257 at 43771.

In February 1989, the Water Board requested that WMAC submit a supplemental SWAT report providing information regarding water quality sampling, the integrity of the levee and clarification of survey data. Based on the information provided, the Water Board stated that "Staff is concerned... that two of the wells (G–03 and G–04) have been consistently showing [contamination]. This could be an indication of leakage of leachate from the landfill as evidenced by the presence of similar constituents in leachate wells GR–04 and GR–13, which are located adjacent to wells G–03 and G–04, respectively." Pl.'s F–29 at 9280. Accordingly, the Water Board asked WMAC to evaluate the leakage and report on its investigation of the integrity of the levee.

In response, WMAC obtained a report on levee conditions from Hydro–Search, Inc., an environmental consulting firm, which confirmed the existence of significant problems. In particular, the 1989 Hydro–Search report found that because of "higher permeability" areas, there were preferential pathways for "leachate migration," and that "leachate may be migrating from the landfill." Def.'s Exh. 278 at 9437, 9431–32. Specifically, the report found that portions of the levee were composed of the more permeable gravel, sand, and silt, and in some cases refuse, and that in certain sections, the levee's permeability was $10^{-4}$ to $10^{-5}$ cm/sec, which is up to 500 times more permeable than the standard set forth in the Water Board's 1978 Order.[9] It suggested installation of a

9. The Water Board's Order 78–84 provided that "Lateral hydraulic continuity with surface water shall be prevented by the presence of a natural barrier of at least five feet in thickness and a permeability of $1 \times 10^{-6}$ cm/sec or less or equivalent. If such a natural condition does not exist, an artificial barrier shall be constructed to meet the above specification." Def.'s Exh. 137 at 7563.

In 1996, seven years after the 1989 Hydro–Search report, another report commissioned by WMAC confirmed levee permeability of $5.4 \times 10^{-4}$ in boring LB–02 just south of LS02. *See* Jt. Exh. 1, Vol. 1 at P000243 (Table 2.7–1).

protective "slurry wall" designed to prevent migration of leachate, but OSC did not implement this recommendation.

Indeed, during these years, the record reflects a pattern whereby OSC and WMAC collected data and information, and noted issues of concern, but took little concrete action to address the growing signs of leachate problems at the site. As an earlier internal memo had candidly admitted, there was little incentive to spend money on the site "since the landfill is no longer producing revenue." Def's Exh. 239. WMAC's passive approach intensified with the impending transfer of title of the final parcel to the Park in March 1990. WMAC took the position that once the Park District obtained title to the entire parcel, that it was 100 percent responsible for any leachate problems at the site. Thus, although WMAC staff recommended in 1990 that WMAC "take the environmental 'high ground' " and "not allow things to slip," Pl.'s Exh. F–34 at 32121, this advice went unheeded, and as late as November 1994, WMAC acknowledged that "there is no 'Existing Leachate Control System' " for the site. Def.'s Exh. 310 at 240.

At the same time, the Park District believed that while it was responsible for "maintenance of the *regional park* facets of the site," Pl.'s Exh. D–12 at 5505 (emphasis in original), WMAC was responsible for all matters arising from OSC's closure of the landfill, including the issue of leach-

ate control.[10] In its view, transfer of title did not discharge this duty or otherwise affect WMAC's obligations. Thus, aside from its repair of the southern half of the levee in 1984–85, the Park District also did not act to address the leachate issues, except when ordered to do so by the Water Board.[11] In 1993, the parties met. They knew that leachate levels in eight monitoring wells were "too high" and that they should try to resolve their dispute over liability "rather than risk the [Water Board] adopting more stringent requirements that could affect both parties." Pl.'s Exh. D–14 at 273. Unfortunately, the parties were unable to do so.

*(2) December 1994—1999*

On December 14, 1994, the Water Board eventually took action, issuing Order 94–187, which updated but did not replace, its previous 1978 and 1980 orders. Directed at both WMAC, as the previous owner and landfill operator, and the Park District, as the current owner, the 1994 Order found that leachate elevation was highly variable and associated with heavy rain fall, and was, in part, the result of poor maintenance of the cover, which had allowed ponding to occur during the rainy season. Finding that the landfill still "does not have any Leachate Collection and Recovery System," the Water Board ordered, among other things, the development and permanent operation of such a system as

---

10. *See also* April 20, 1995 Memorandum from Park District to the Water Board explaining "Park District's long-standing position (as per consultation with District Counsel) that the Park District would be responsible for compliance issues associated with developing the surface of the site into a park, but that Waste Management would continue to be responsible for anything below the surface related to depositing garbage or other wastes including water quality monitoring and any leachate or containment management necessary." Def's Exh. 417 at 397.

11. In March 1993, the Water Board sent the Park District a notice to take immediate action to correct improperly graded areas at the site which were allowing ponding and inadequate run-off to occur. Pl's Exh. H–1 at 257–58. The Park District undertook some regrading and other work in response and developed a specific winterization program in 1988 or 1989. As of trial, however, it had not yet submitted its winterization plan in writing to the Water Board.

part of an overall leachate management plan that "shall prevent leachate migration off the site." Pl.'s Exh. E–41 at 3546, 3550, 3552.

Monthly leachate elevations for January 1, 1995 were well over 7.5 MSL in nine of the 13 wells. Shortly thereafter, in late March and early April, following what proved to be "an exceptionally wet winter," Def.'s Exh. 417 at 397, visual inspections revealed that leachate was seeping into the San Francisco Bay through points on the northern portion of the levee, which the parties promptly reported to the Water Board. Specifically, "[a]bout 200 lineal ft. of shoreline … had several small flows of reddish brown liquid suspected to be leachate emanating from the landfill down the edge of the dike running downslope through the rip-rap into S.F. Bay." Def.'s Exh. 417 at 396.

Although WMAC did not consider itself responsible, given the seriousness of the situation it agreed to immediately contract with Rust Environment and Infrastructure, Inc. ("RUST"), a wholly-owned subsidiary, to undertake an emergency short-term mitigation response. This consisted of capping the seepage areas with clay fill and raising the levee several feet in the affected areas. In addition, 1,100 gallons of leachate were pumped from LS–2 into a Baker tank surrounded by a clay berm.

The situation was in fact an emergency, given the ongoing leakage of hazardous waste into the Bay. Indeed, "due to the urgent circumstances" site work was conducted "into the night on April 11 with the use of flood lights." Pl.'s Exh. F–36 at 27035. On the other hand, the emergency action was plainly preventable, and necessitated by years of inaction. Indeed, the seeps were in or near the areas specifically identified as problem points in Hydro–

Search's report in 1989, and as early as 1987 OSC knew the northern levee perimeter was in "a debatable state of repair." Def.'s Exh. 246 at 42851.

Thereafter, at WMAC's direction, RUST undertook (1) an initial area investigation in order to design and implement a pilot leachate extraction and treatment system that could be used to prevent seeps during the next winter in the same area, and (2) a Remedial Investigation/Feasibility Study ("RI/FS"), known as the Leachate Management Investigation Report and Feasibility Study. The latter, referred to by the parties as the RUST report, required RUST to undertake a comprehensive analysis of the landfill and various leachate management alternatives, and recommend a leachate management plan that would comply with the Water Board's 1994 Order.

The RUST report found that the "principal source of leachate generation at the site is infiltration of precipitation through the landfill cover, which is estimated at 27 million gallons/year." Jt. Exh.1 at P000006. It estimated, however, that Park District plans to place additional, impermeable bay mud on the site (necessary to develop turf areas of the park that require special irrigation), would reduce the infiltration of precipitation through the cover to 15 million gallons/year.[12]

The RUST report also concluded that between 13—19 million gallons of leachate was flowing through the levee each year. Indeed, it found that while all of the leachate monitoring wells, except for two, showed an overall increase in leachate elevations over time, leachate elevations typically rose one to two feet during the winter rainy season and then fell again during the dry summer season, Jt. Exh. 1 at

---

12. The Park District's previous placement of 36 acres of bay mud already reduced infiltration by roughly 6 million gallons per year. *See* O'Brien Trial Decl. at ¶ 8.4.

P0000037, a pattern consistent with the conclusion that leachate has been escaping through the levee. *See also* O'Brien Trial Decl. at ¶ 3.2. RUST expected that most of the leachate was evaporating, and that the 1995 levee emergency response levee repairs slowed the flow; it did not, however, quantify the amount of the leachate still escaping.

RUST recommended a phased leachate management approach, with design and implementation of an initial leachate control system in the vicinity of the leachate seeps. With respect to a long term solution, RUST recommended extracting the leachate through a network of vertical extraction wells, pretreatment if necessary, and then conveyance by pipe to the nearby San Leandro Publicly Owned Treatment Works ("POTW") for treatment—the very approach OSC had declined to put in place years earlier. RUST further proposed, as an interim measure until the permanent collection and disposal system could become operational, continued monitoring, and if necessary, leachate recirculation.

During the remedial investigation, WMAC determined that eight of the 10 groundwater monitoring wells that OSC had constructed in 1984 and 1988 were improperly installed without conductor casings, and thus actually acted as "preferential pathways" for leachate to escape into the groundwater. In 1996, WMAC destroyed and sealed the defective wells and replaced them with properly installed wells. Thereafter, groundwater contamination measurements dropped. In 1996–97, the Park District also upgraded the southern portion of the levee, and installed pipes, conduits, and vaults that could be

utilized as part of a leachate conveyance structure.

WMAC began talking to the city of San Leandro in the Fall of 1995 regarding the use of the POTW. Although it had been close to finalizing its application for a discharge permit from the San Leandro POTW several years earlier, WMAC had let the matter drop in 1988 and now had to essentially start over. This time it took four years for WMAC to convince San Leandro to accept the leachate without pretreatment, a less costly alternative than pretreatment, and a discharge permit was not issued until September 1999. In the meantime, as an interim, stop-gap measure to prevent leachate from flowing into the Bay, WMAC recirculated leachate from the northern perimeter of the site (where the seeps were sighted), and re-injected it into the interior of the landfill during the winters of 1995–1996, 1996–1997, and 1997–1998, successfully lowering leachate levels in the area of the seeps.[13] WMAC did not operate the recirculation system in 1999 because it thought the collection system would be operational by then.

At WMAC's request, the Park District began conducting and documenting site inspections in 1995. In 1996 RUST also trained Park District staff to measure the leachate levels and they began monitoring leachate levels and the condition of leachate wells and well caps until told by RUST that it was no longer necessary to do so, sometime in 1998.

On June 18, 1999, WMAC sent the Water Board its "Record of Decision," in which it formally notified the Board that it had selected, as its long-term remedy, RUST's recommended solution of pump-

---

**13.** While the Water Board does not generally favor recirculation, it was willing to accept this interim solution under the circumstances. As Marc Yalom at WMAC explained, "[g]enerally the Water Board doesn't allow recircula- tion of leachate. But owing to the circumstances and the preventive nature of the— what we were trying to accomplish, Mr. Scott gave his acquiescence if not his approval that it would be okay to do this." Tr. 348.

ing, collecting, and conveying the leachate to the San Leandro POTW. As suggested by RUST, WMAC is installing this remedy in phases. This approach allows WMAC to focus first on the area experiencing the prior seeps and also to "develop a better understanding of how the landfill as a whole works in terms of leachate extraction so that what we do in the future in terms of installation of wells can be done as economically as possible." Dukes Tr. 283. The first phase, with seven wells in the vicinity of the 1995 leachate seeps, is complete and started operating continuously on October 20, 1999. As of the date of the trial there was no definite schedule for implementation of the remaining phases, although the collection of data on leachate levels that would help determine the scope of the further action, was underway.

Finally, as to financial expenditures, WMAC has covered the vast majority of the costs incurred to date relating to leachate management at the site. Specifically, the parties have stipulated that WMAC incurred $4,091,431.86 in site related costs through August 31, 1999, that it seeks to recover from the Park District.[14] In turn, the Park District seeks to recover $454,233.00 that the parties agree it in-

curred in 1996–97 in connection with the levee repair and leachate conveyance system piping project.[15]

## II.

### DISCUSSION

Congress enacted CERCLA, 42 U.S.C. §§ 9601–9675, to respond to the " 'threat to public health and the environment posed by the widespread use and disposal of hazardous substances.' " *Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1300 (9th Cir.1997) (citation omitted). As such, its purposes are two-fold: first, to "ensure the prompt and effective cleanup of waste disposal sites," and second, to "assure that parties responsible for hazardous substances [bear] the cost of remedying the conditions they created." *Id.* (citation omitted); *see also Kaiser Aluminum Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1340 (9th Cir. 1992).

CERCLA accomplishes these purposes by, *inter alia*, providing legal redress for private parties who are engaged in clean up efforts but believe they have incurred or will incur greater than their fair share of the cost. Such parties may bring two

---

14. These costs can be itemized as follows:

| | | |
|---|---|---|
| 1. | Cover thickness evaluation for redevelopment: | $ 21,286.66 |
| 2. | Earthquake Response Plan: | $ 4,417.27 |
| 3. | Emergency Response: 1995 Emergency Levee Action: | $ 210,093.70 |
| 4. | Emergency Response: Preliminary Seep Investigation: | $ 217,696.42 |
| 5. | FEMA Assistance: | $ 3,188.00 |
| 6. | Groundwater Detection Monitoring Program: | $ 34,952.81 |
| 7. | Groundwater Monitoring: | $ 341,386.26 |
| 8. | Leachate Management System Design and Construction: | $1,114,740.24 |
| 9. | Leachate Recirculation System: Winter 1995–1996: | $ 262,168.98 |
| 10. | Leachate Recirculation System: Winter 1996–1997: | $ 76,857.01 |
| 11. | Leachate Recirculation System: Winter 1997–1998: | $ 172,986.97 |

| | | |
|---|---|---|
| 12. | Leachate: Design for VOC Pretreatment Only (Air Stripper): | $ 159,621.46 |
| 13. | Leachate: POTW Application/SBR Design/Construction/etc | $ 500,673.76 |
| 14. | Remedial Investigation/Feasibility Study: | $ 971,362.32 |

15. This amount can be itemized as follows:

| | | |
|---|---|---|
| 1. | Leachate Recovery System | $ 62,700 |
| 2. | OSHA level D protection for workers | $ 15,000 |
| 3. | clear and grub portions of the Site- | $ 20,000 |
| 4. | earth work | $100,000 |
| 5. | shore protection (rip rap)- | $150,000 |
| 6. | 2–inch PE Pipe installation- | $ 9,000 |
| 7. | additional fill work- | $ 20,191 |
| 8. | leachate pipes and vaults- | $ 75,342 |

types of actions: (1) a cost recovery action against responsible parties to recover response costs already incurred in cleaning up hazardous waste so long as such costs were necessary and consistent with the national contingency plan, 42 U.S.C. § 9607(a)(4)(B); and (2) a claim for contribution from responsible parties in which the Court allocates the defendant's share of liability for past and future response costs. 42 U.S.C. § 9613(f)(1); *see also* 42 U.S.C. § 9613(g)(2); 28 U.S.C. § 2201; *Pinal Creek*, 118 F.3d at 1300; *Environmental Transp. Systems, Inc. (ETS). v. EN-SCO, Inc.*, 969 F.2d 503, 506–07 (7th Cir. 1992).[16]

In this case, both the Park District and WMAC qualify as "responsible parties" for purposes of CERCLA liability. A party so qualifies if it (1) owns or operates a facility where hazardous substances were disposed of, (2) previously owned or operated such a facility, (3) arranged for the disposal or treatment of hazardous wastes at the facility, or (4) transported hazardous substances to the facility. 42 U.S.C. § 9607(a)(1)-(4); *Kaiser Aluminum*, 976 F.2d at 1340–41. The Park District qualifies as the current owner of the site,[17] while WMAC qualifies as a past owner, past operator, and "arranger." As the parties agree, the remaining prerequisites for maintaining a cost recovery or contribution action are also satisfied here: (1) Oyster Bay Regional Park is a "facility" as defined by CERCLA, (2) there was a release of hazardous substances, and (3) the release caused WMAC to incur response costs. *See ETS*, 969 F.2d at 506.

What is in dispute, however, is (1) the degree of liability each party should bear, and (2) whether the response costs already incurred by WMAC were necessary and consistent with the national contingency plan ("NCP"), such that it can recover the Park District's proportionate share, if any, of those costs. The Court turns first to the issue of the appropriate allocation of responsibility.

A. Contribution Under 42 U.S.C. § 9613(f)(1)

Anticipating the unique nature of these cases, Congress gave district courts wide latitude to resolve claims for contribution. The statute states simply that "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). WMAC argues that the equities in this case warrant a finding that the Park District is liable for 75% of past and future response costs. The Park District, by contrast, argues that WMAC should be largely or wholly responsible for such costs.

■ In exercising its discretion, the Court need not limit itself to any particular set of factors. Rather, the broad language employed by Congress indicates its "intent to allow courts to determine what factors should be considered in their own discretion ...." *ETS*, 969 F.2d at 509. Accordingly, courts may consider "any factors appropriate to balance the equities in

---

**16.** As noted above, the complaint also alleges analogous claims under the HSAA, §§ 25300 *et seq.* Because these claims are duplicative of the parties' CERCLA claims, they will not be discussed further.

**17.** WMAC argues that the Park District is also liable as an "operator" based on the Park District's opportunity fill program and tempo-

rary storage of dredge spoils from Lake Temescal and sludge from the San Leandro POTW, which, WMAC argues, contained hazardous substances. The evidentiary record does not, however, support a finding that Park District's involvement with these activities qualify it for "operator" liability under CERCLA.

the totality of the circumstances." *Id.* Indeed, given that "the allocation of cleanup costs is a type of decision particularly suited to case-by-case determination," a court may consider "several factors, a few factors, or only one determining factor." *Id.;* *see also Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187–88 (9th Cir.2000); *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 572–73 (6th Cir.1991).

■ The array of (sometimes overlapping) equitable factors identified by courts include (1) the parties' relative fault or culpability, (2) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished, (3) the amount of hazardous waste involved, (4) the degree of toxicity, (5) the degree of involvement of the parties in the generation, transportation, treatment, storage or disposal of the hazardous waste, (6) the degree of care exercised by the parties with respect to the hazardous waste, (7) the degree of cooperation by the parties with government agencies to prevent harm to the public health or the environment, (8) financial resources or economic status, (9) economic benefits received by the parties from contaminating activities or remediation, (10) knowledge and/or acquiescence of the parties in the contaminating activities, and (11) contracts between the parties. *See ETS*, 969 F.2d at 509; *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1206 (2nd Cir.1992); *R.W. Meyer*, 932 F.2d at 571, 573 n. 6; *Boeing Co. v. Cascade Corp.*, 920 F.Supp. 1121, 1132 (D.Or.1996); *aff'd in part*, 207 F.3d 1177 (9th Cir.2000); *Alcan–Toyo America, Inc. v. Northern Ill. Gas Co.*, 881 F.Supp. 342, 345 (N.D.Ill.1995). With the above in mind, the Court turns to the equitable factors most pertinent to the case at bar.

### (1) Introduction

■ Unlike some cases, in this instance, the source of the hazardous waste problem is clear: the 6 million tons of garbage that OSC deposited at the Davis Street landfill over a period of almost 40 years. It is equally clear that operation of the municipal dump was central to OSC's commercial interests. Basic principles of equity would suggest that the party that has profited for 38 years from the creation and operation of a landfill should bear primary responsibility for the hazardous byproducts of its activity. *See Pinal Creek Group*, 118 F.3d at 1300 (purpose of CERCLA is to ensure that party responsible for hazardous substance bears cost of remedying conditions); *Amland Props. Corp. v. Aluminum Co. of America*, 711 F.Supp. 784, 789 (D.N.J. 1989) (overarching goal of CERCLA is to place cost of cleanup on parties responsible for creating the hazardous condition).

WMAC contends, however, that a number of factors warrant shifting primary responsibility to the Park District in this case. Among other points, WMAC argues that the Park District has benefitted by receiving valuable property for free, and that it could have returned the site if it wanted to avoid the responsibilities of ownership. WMAC also asserts that the leachate problems are mostly attributable to the Park District's lax maintenance of the site. After carefully considering these and other relevant equitable factors, however, and the evidentiary record as a whole, the Court is not persuaded, for the reasons explained below, that the Park District should bear significant liability for leachate contamination at the site.

### (2) Economic Benefits

WMAC vigorously argues that the Park District should bear primary responsibility for environmental hazards arising from the landfill because it enjoys the economic

benefit of owning a valuable, bay front property—and, on top of that, it acquired the site for free. At bottom, this is essentially an argument that the Park District should be responsible for leachate problems at the site because (1) it enjoys the status of current owner, and (2) WMAC's liability as a former owner should be minimized because WMAC gave the property to the Park District as a donation. *See also* Pl.'s Post–Trial Br. at 29 ("logic ... dictates that in *donating* nearly 200 acres of Bay frontage land ..[]. the expenses ... would also be transferred") (emphasis added).

The simple fact of current ownership, however, is not particularly persuasive. Indeed, if current ownership, was by itself, a dispositive or overriding factor, there would be no need for courts to carefully allocate responsibilities among several categories of responsible parties (*e.g.* owners, prior owners, operators, arrangers or generators, and transporters) using a variety of equitable considerations, as CERCLA clearly requires. *See* 42 U.S.C. §§ 9607(a), 9613(f)(1). Moreover, as the case law indicates, unless the current owner is responsible for the contamination, owned the land during disposal of the waste, or played some other contributory role, the mere fact of current ownership, is not usually considered a significant factor weighing in favor of a large share of liability. *See, e.g., Gopher Oil Co. v. Union Oil Co. of Cal.,* 955 F.2d 519, 523, 527 (8th Cir.1992) (where prior owner responsible for contamination, current owner allocated zero liability); *Foster v. United* States, 130

F.Supp.2d 68, 77, 2001 U.S. Dist. LEXIS 742 at *29 (D.D.C. 2001) (same); *Alcan–Toyo,* 881 F.Supp. at 347 (prior owners responsible for disposal allocated 90% liability). In short, WMAC's oft-stated complaint that it would be unfair for the Park District, as the current owner, to enjoy the benefits of remediation without footing the bill is simply out of step with the CERCLA statutory scheme, which focuses not on current ownership *per se* but on the real world acts and contributions of *all* present and prior owners as well as other parties that may have created or otherwise fostered the hazardous contamination.

Second, WMAC's donation of the landfill to the Park District was not a simple altruistic act that warrants a reduced level of responsibility. As the record reflects, WMAC's donation of the landfill to the Park District was less an act of charity than a hard-nosed business calculation designed to achieve its business objectives. Indeed, WMAC gained substantial economic benefits from the "park for transfer station deal." For example, because the deal netted WMAC a four-year extension on its permit, WMAC saved $12–16 million by avoiding the costs of long hauling the garbage to more distant sites during this time.[18] The deal also enabled WMAC to use garbage, as opposed to clean fill, to meet the grade requirements for closing the site, resulting in a savings of roughly $9 million dollars. While the parties dispute the calculation of the present value of these benefits, it is clear that they run in the tens of millions of dollars.[19] WMAC

---

**18.** WMAC claims that any additional costs incurred from long hauling would have been passed on to the rate payers. It is impossible to definitively know how the governing Joint Refuse Rate Review Committee would have responded to this situation. Based on the record, however, the Court concludes that OSC's ability to pass on that cost is specula-

tive at best, and that it is likely that OSC would have had to absorb this expense.

**19.** Under the Agreement, OSC also reserved to itself all rights to and interests in landfill gases at the site and, since 1979, has allowed Getty to harvest and sell landfill gases in return for a 12.5% royalty. While WMAC did not disclose the extent of the royalties re-

also benefitted of course, by obtaining permission to build the needed transfer station. In short, WMAC donated the landfill because that course of action yielded enormous financial benefits. Had other options appeared more advantageous, such as selling the site outright or developing it commercially, the Court is confident that OSC would have pursued such an alternative instead.

WMAC's converse argument—that the Park District should bear a larger share of the liability because it obtained a property of great value for free—rings similarly hollow. WMAC's expert, Stanley Tish, appraised the property as having a value of $3,240,000 under current zoning. Even assuming this testimony to be correct,[20] it not only pales in comparison to the economic benefits WMAC obtained from the "park for transfer station deal," but the argument also fails to appreciate that the Park District does not hold the property to make a profit as a commercial enterprise. Rather, it accepted ownership of the property solely for the public purpose of creating open shoreline space for the benefit of the community. Given this exclusive mission, the fact that the property may have some commercial value is of little benefit to the Park District.

The Park District has of course benefitted from San Leandro's decision to leverage its municipal powers to encourage donation of the site, and this is a relevant factor that should be taken into account in apportioning liability. WMAC's contention, however, that the Park District has unfairly economically benefitted as the current owner because it obtained a property of tremendous value for free, distorts the record and true nature of the circumstances. Rather, a fair review of the facts shows that the substantial economic benefits enjoyed by OSC balance out, if not overshadow, the economic benefits to the Park District.

### (3) Park District's Knowledge of Risks and Acceptance of Responsibility

WMAC also contends that when the Park District (a) signed the Agreement in 1979, and (b) later accepted title of the last parcel in 1990, that it knew about the environmental risks and knowingly accepted responsibility for them. As such, it argues, it is only fair that the Park District be held to the responsibility it accepted.

The Court agrees with WMAC that, in 1979, the Park District was aware of the potential for environmental contamination at the site, and by 1990, knew that the potential for leachate problems was more than hypothetical. As such, the Park District is not in the position of an innocent and unsuspecting purchaser, a relevant consideration in making an equitable allocation. *See Minyard Enters. Inc. v. Southeastern Chem. & Solvent Co.,* 184 F.3d 373, 387 (4th Cir.1999). As explained below, however, the record does not demonstrate that the Park District accepted primary responsibility for such risks, either as a matter of contract, or by accepting title to the final parcel in 1990.

### (a) The 1979 Agreement

With respect to the 1979 Agreement, this Court previously held, in denying the Park District's motion for partial summary

---

ceived over the life the Getty contract, as of 1986 over $1 million had been paid to OSC or WMAC. In more recent years, however, the gas has generated little or no royalties.

**20.** Mr. Tish's testimony that the site is worth $22 million if dedicated to its "highest and best use" of a golf course is unpersuasive given the presence of other golf courses already in the vicinity and the various planning and land use issues that would present serious obstacles to such a development.

judgment, that the agreement did not allocate, one way or the other, long term environmental responsibility for leachate. A review of the supplemental documents submitted by WMAC does not change this conclusion.

While parties may transfer CERCLA liability by contract, the contract language must be clear and unambiguous. *See Mobay Corp. v. Allied–Signal, Inc.*, 761 F.Supp. 345, 358 (D.N.J.1991) (contract must contain "clear provision" which affirmatively allocates risks to one of the parties); *U.S. Steel Supply Inc. v. Alco Standard Corp.*, No. 89–C–20241, 1992 WL 229252, * 7–8, 1992 U.S.Dist. LEXIS 13722, at * 20–21 (N.D.Ill. Sept. 9, 1992) (contractual language must "clearly and unequivocally indicate[ ] that it is the parties' intent to transfer [CERCLA] liability").

To be sure, the extensive extrinsic evidence submitted by the parties demonstrates that OSC flatly refused to agree to contractually accept any long term environmental responsibility, and that the Park District, knew as a consequence, that it faced *the risk of* financial exposure

should environmental problems develop. Nowhere in the 1979 Agreement, however, does the Park District ever expressly and affirmatively agree that *it* would accept the entire liability for *all* long term environmental costs as a matter of contract. Rather, it expected that such matters would be addressed largely by the Water Board. As such the Court reaffirms its conclusion that the contract avoided rather than squarely faced this contentious issue, and thus failed to clearly and unequivocally shift CERCLA liability to the Park District.[21]

### (b) Acceptance of title to the final parcel in 1990

As detailed earlier, the 1979 Agreement provided for the Park District to take title to the site in three phases. It also gave the Park District the option to return the entire property (which would revert to the City of San Leandro or WMAC) instead of accepting title to the final parcel. Accordingly, WMAC argues, the Park District was under "no compulsion" to keep the property if it felt that "the burdens of stewardship outweigh[ed] the benefits of ownership." Pl.'s Post–Trial Br. at 26. Rather, if the Park District wanted to rid

---

**21.** In its December 14, 1999 "Addendum to Trial Brief," WMAC appears to concede the contractual issue. *See* Addendum at 3 ("On October 4, 1999, this Court correctly ruled that the '79 Option Agreement does not allocate, one way or the other, responsibility for what has been referred to variously as post-closure environmental liability for leachate or long-term liability for leachate." ') (citation omitted). It argues, however, that the evidence shows that, in the absence of an express contractual allocation the Park District understood that "clear provisions of California law" provided for "responsibility to go to the purchaser" and that this factor should be considered in weighing the equities in this case. *Id.* at 3–4.

In making this argument WMAC relies heavily on a report by a consultant, Kevin Shea, of the Toxics Assessment Group, who did an overall assessment of the site for the

Park District in 1986. In that report Mr. Shea opines that the Park District was aware in 1979 that by assuming ownership of the site, it would also be responsible for the long term containment of the waste. The Court agrees with the Park District that this opinion deserves no weight given that Mr. Shea (who is not a lawyer) rendered this opinion years after the fact without having spoken to any person involved in the contract negotiations or otherwise having any knowledge of the circumstances surrounding the Agreement. Moreover, while the Park District knew that there was a risk of liability, it is not at all certain that in 1982, when the Park District accepted title to the first parcel, that imposition of primary liability upon the Park District was mandated under California law. In any event, this is not a major factor relative to the other equitable considerations in this case.

itself of all liabilities for the site all it had to do was exercise the option to return the property. By declining this ready escape option, and accepting title to the final parcel in July 1990, WMAC concludes, the Park District accepted responsibility for all burdens relating to the site.

WMAC characterizes this argument as "[t]he most important ... in terms of fairness." Pl's Post–Trial Br. at 26. At bottom, however, this argument—that acceptance of ownership equals acceptance of responsibility—is simply a variation of its argument that the Park District should be primarily responsible for the costs of remediation simply by virtue of its status as the present owner, and irrespective of the role of OSC and WMAC in contributing to the waste or leachate contamination. For the same reasons discussed above, the Court is not persuaded that this factor justifies imposing substantial liability upon the Park District in this case.

Nor does the evidence support WMAC's contention that it is only fair to hold the Park District primarily responsible because it accepted title to the final parcel in 1990 with the knowledge and expectation that ownership would bring full responsibility for any waste-related problems. First, WMAC's reliance on Kevin Shea's 1986 report to support this argument is misplaced for the reasons stated above. *See* note 21, *supra.* Second, as the Park District's correspondence to WMAC makes clear, the Park District decided to accept title to the final parcel in 1990 with the firm belief that WMAC would likely be held responsible for post-closure compliance based on a variety of factors, including "post–1983 laws and regulations

pertaining to the closure of landfills, the various orders issued by the Water Board and the terms of the Option Agreement." Def's Exh. 482–R at 5960.

### (4) Fault or Cause of the Leachate Problems at the Landfill

Municipal landfills typically contain some leachate. The danger arises when leachate is allowed to accumulate or escape from the landfill—which is why the process of closing a landfill is closely regulated. In this case, as the Court has described in detail above, leachate began escaping from the landfill into the San Francisco Bay as well as into the groundwater. Pointing fingers, both sides contend that the other is mainly to blame. While WMAC "acknowledges that its predecessor did operate the municipal landfill from about 1942 to about 1983, and that control of leachate is a common part of stewardship of closed municipal landfills," Pl.'s Post Trial Br. at 26–7, it argues that the Park District's lax maintenance of the landfill is the primary source of the problems. The Park District contends, however, that any maintenance-related problems were minimal and that the leachate problems can be largely traced to WMAC's failure to adequately close the site and implement a leachate collection system in a timely manner, as required by the Water Board.

The Court agrees with WMAC that the Park District did not have the resources or training to implement a comprehensive cover maintenance program. Thus, while the Park District undertook regular maintenance, and has improved its maintenance efforts in recent years,[22] there is some

---

22. For example, since approximately 1989, the Park District has undertaken steps to "winterize" the site each year. This includes checking the site for low spots and other things that needed to be corrected before the rainy season begins. More recently, the Park District has started constructing, as part of this effort, berms on the uphill side of the remaining construction debris piles to direct water around the debris. The Park District

degree of erosion in the cover in the form of cracks, burrowing animal holes, some overgrown vegetation, occasional blocked drainage paths, and occasional ponding. Depending on the degree of severity (e.g. the depth of the hole or crack), such defects can permit rain to infiltrate more readily through the cover.[23]

The parties vigorously dispute the actual extent and severity of the ponding, burrowing holes,[24] excessive vegetative growth, cracks (which appear to be mostly superficial), etc., that have existed over the years. The often conflicting, and sometimes spotty evidence, on these matters does not persuasively demonstrate that poor maintenance is primarily at fault. Rather, the record indicates that maintenance-related issues have had no more than a minor impact on the actual integrity of the site.

First, WMAC relies primarily on the testimony of Dr. Hari D. Sharma, who opined that roughly 70 percent of the leachate levels at the site are due to defects in the landfill cover caused by poor maintenance. His testimony was too inherently unreliable, however, to be given any weight. As Dr. Sharma conceded, it is impossible to use a model to directly measure the effect of maintenance factors on the amount of infiltration through a landfill cap. Accordingly, he relied on an indirect approach that was based on highly questionable assumptions, was not peer-reviewed, and had been designed solely for the purposes of the litigation in this case. Dr. Sharma also refused to consider alternative explanations for his results. Nor did Dr. Sharma or his company, Geosyntec, ever use any instrumentation at the landfill to try and measure actual infiltration. Finally, Dr. Sharma's credibility is also diminished by the fact that WMAC is a periodic client of Geosyntec.

Notably, while RUST's 1996 comprehensive investigative report noted "significant ground squirrel movement and burrows"

---

also grades the roads and other portions of the Site that have received opportunity fill. At the beginning of, and throughout the rainy season, the Park District monitors the drainage swales and other drainage areas on a daily basis to confirm that drainage is occurring and, if not, to correct any areas of concern.

**23.** WMAC also contends that the Park District was required by the 1979 Agreement (as amended) to maintain a 3 percent grade throughout the site. This grading requirement was part of the closure requirements and was intended to promote the run off of rainwater. WMAC further argues that the Park District's failure to maintain the 3 percent grade weighs in favor of finding the Park District at fault for the leachate problems at the site. The Court disagrees. First, it is not at all clear that the Option Agreement, as amended, makes the Park District responsible for maintaining this closure requirement. Rather, it appears more likely that the parties intended that the Park District was responsible in the event that settlement of the cover required additional fill to achieve contours required for *Park* development or aesthetics. Second, expert testimony demonstrated that at least some portion of the site had less than 3% slopes *in June 1983*, shortly after OSC completed its cover, strongly suggesting that, regardless of any maintenance issues, OSC's original cover did not uniformly comply with the 3 percent slope requirements. *See* Ashley Trial Decl.; O'Brien Trial Decl., Tabs 7, 8. Finally, the evidence is less than clear that the variations in grade (currently 15 percent of the site is less than 3% grade) are a significant cause of the leachate problems at the site. *See, e.g.,* Duke Tr. 223 (If RUST had judged that maintenance of 3 percent grade was a cost-effective way of significantly reducing leachate at the site it would have "costed that out").

**24.** The burrowing animals are an important food source for sensitive species that live at or visit the Site, such as hawks, golden eagles and owls. Given this, and the fact that the Water Board appeared to have no problems with the holes, the Park District decided not to institute a plan to exterminate the burrowing animals.

during its site-wide field investigation, Jt. Exh. at P000117, and suggested that maintenance practices could further improve, it never identified poor maintenance as a major or even significant cause of the leachate problems at the site. This is consistent with the deposition testimony of Richard McMurty, a division chief at the Water Board, who stated that, based on inspections performed by his staff in 1993—1995, that maintenance related issues did not cause any major failure of the system and that the Park District, in his opinion, has been a "minor contributor to the problem." McMurty Depo. Excerpt at 60. The Court also notes that one monitoring well showed a leachate level of 8.0 as early as May 1983, and by 1986 the Water Board was raising concerns about leachate levels and the integrity of the levee—presumably before any maintenance related defects would have had an opportunity to manifest themselves in any substantial way.

Instead, considering the record as a whole, the Court finds that a more likely explanation for the massive infiltration experienced by the site—27 million gallons per year—and the escape of millions of gallons of leachate, is a fundamental failure of the cap and levee. As subsequent studies have shown, the quality of the cap soil is uneven and portions of the levee were far more permeable than permitted by the Water Board. *See also* O'Brien Trial Decl. at §§ 3.0–3.2. Moreover, the cap was designed based on assumptions of average rainfall; yet, subjected to El Nino and other unusually heavy winter storms.[25] Notably, as early as 1987, an internal OSC memo acknowledged that "[t]here was little evidence of surface runoff throughout the site despite decent existing grading. Reason seems to suggest that the landfill cover, at least in parts, is ineffective in preventing rainfall intrusion." Def.'s Exh. 246 at P042852. Indeed, OSC was aware, at the time it opted for the water balance approach, over the traditional impermeable clay cap, that its consultants lacked prior experience with this method and could not guarantee the results.[26]

WMAC relies on the Water Board's 1984 determination that "closure requirements had been achieved" to argue that a faulty cap and levee can not be to blame. The Water Board was not privy, however, to the subsequent intensive geological analysis of site characteristics undertaken by Hydro Search in 1989 and RUST in 1996, or the confirming anecdotal evidence presented at trial. Rather, in making its determination, the Water Board appears to have relied solely on simple visual inspections, along with representations from OSC's consultants, Bissell and Karn. Nor of course, was the Water Board privy to RUST's conclusion that there is massive

---

**25.** At trial, Ralph Bickford, OSC's consultant on the closure process, suggested that the fill and grade requirements in OSC's closure plan contained a built-in safety valve in case of above average rains. The closure plan, itself, however, does not indicate that the grade or fill levels were specifically tailored to counter severe rains or a worst case "El Nino" year. Even assuming they were to some degree, this testimony does not demonstrate the actual effectiveness of any such "safety valve."

**26.** WMAC argues that history has shown that water balance covers perform better than clay covers in temperate climates because clay is more brittle and more subject to drying. *See* Pl.'s Exh. T–08 (Sanglerat Decl.) at 5, ¶ 16. Governing California regulations, however, do not favor the water balance approach over a clay cap. Rather, they still require any closure of a solid waste landfill to include at least one foot of soil that is compacted "to attain hydraulic conductivity of either $1 \times 10(–6)$ cm/sec or less [i.e. a clay cap] ... or another design which provides a correspondingly low through-flow rate throughout the post-closure maintenance period." Cal.Code Regs. tit. XXVII, § 21090(a)(2).

infiltration of precipitation through the cover and escape of leachate through the levee. Under these circumstances, the Court declines to treat the Water Board determination as conclusive evidence of the actual conditions of the cap and levee [27]

#### (5) Cooperation with Government Agencies/Conduct of the Parties

Both parties paint themselves as being fully cooperative with the Water Board and acting as responsibly as possible to developing circumstances at the site. Yet their sometimes vitriolic, and ever constant, attacks on each other's conduct or lack thereof, has clouded the record and made it difficult at times to sort out the myriad of accusations. This case certainly evokes the observation made in *Browning–Ferris*, that the "conduct of the parties" factor in these cases often "results in an inordinate amount of mudslinging in an effort to make each party look like the bad guy ... [N]either party comes out smelling like a rose." *Browning–Ferris Indus., of Ill., Inc. v. Ter Maat*, 13 F.Supp. 2d 756, 778 (N.D.Ill.1998), *rev'd in part on other grounds*, 195 F.3d 953 (7th Cir.1999).

Having reviewed the record here the Court concludes that WMAC has far overstated its case in its effort to portray the Park District as uncooperative, irresponsible, and recalcitrant. On the other hand, WMAC's conduct, especially since 1995, does not justify the level of attack launched by the Park District. What does stand out to the Court, however, is OSC and WMAC's general pattern of conduct up until 1995—a pattern that is marked more by foot-dragging than action. While OSC and WMAC cooperatively obtained and supplied information over the years, they did not responsibly follow through with needed mitigation measures despite persistent signs of leachate problems at the site.

As previously noted, the Water Board only allowed OSC to employ the riskier, lesser known (and less expensive), water balance method, instead of an impermeable clay cap, on the condition that OSC install its "leachate monitoring and collecting system." Def.'s Exh. 178 at 3698. OSC also understood that, in closing the Landfill, it was responsible, at bottom, for preventing leachate from being "discharged to waters of the State." Def.'s Exh. 137 at 7563. As detailed in the factual background, above, however, OSC and WMAC resisted installing a functioning collecting system, declined to pump when leachate elevations exceeded 8.0 MSL, and otherwise avoided taking concrete steps to ensure that leachate was not discharging to the waters of the State—perhaps in the hopes that it could simply shift these responsibilities to the Park District when it took title to the final parcel in 1990.

In 1986, for example, the Water Board expressed concerns regarding leachate levels and the lack of a leachate control system (apparently realizing that its earlier determination on this point had not adequately resolved the matter). Although OSC responded by representing that it had installed a "control system" and that arrangements would be made with the San Leandro Sewage Treatment Plant to accept leachate either by tank truck load or pipeline, those arrangements were never finalized despite increasing signs that

---

**27.** WMAC's contention that the Park District should be precluded from questioning the Water Board's determination of compliance is meritless. Indeed, to the extent that the Water Board erred, as a matter of equity, the risk of such error should plainly lie with OSC, the party responsible for closure, and not the Park District. This is particularly so given that it was OSC's choice to utilize an alternative approach to the traditional impermeable cap.

pumping would be necessary. Indeed, although leachate levels reached 9 feet in 1988 (well beyond what OSC had been advised should trigger pumping), and the 1989 HydroSearch report warned WMAC that leachate may be leaking from the landfill, OSC and WMAC took advantage of an inattentive Water Board to wait until "emergency" conditions forced action in 1995. As a result, it was not until 1999, thirteen years after its 1986 representations, that a leachate collection system was put in place. And while leachate was recirculated for three winters from 1995–98, it appears likely that an untold amount of leachate has seeped into the Bay.

WMAC argues that it is the Park District that has acted irresponsibly because it failed to respond to the Water Board's 1994 Order, although it was addressed to both WMAC and the Park District. It is certainly true that the Park District largely left it to WMAC to respond to the Water Board's 1994 Order, although for the most part it fully cooperated with those efforts. The Park District's failure to take on a larger role, however, does not persuade the Court that it should bear a larger share of liability. Given OSC's role in creating and operating the landfill, the relative resources of the parties, and the history of foot dragging by OSC and WMAC, the Park District's decision to take a secondary role in responding to the 1994 Order should not be penalized.[28] Rather, for the reasons discussed above, the Court finds that this factor weighs in favor of imposing a larger share of the responsibility upon WMAC.

### (6) Public Interest

Because the Park District is a public agency with limited resources the Court may consider the public interest as a factor. See Meyer, 932 F.2d at 572 ("The hallmark of a court of equity is its ability to frame its decree to effect a balancing of all the equities and to protect the interests of all affected by it, including the public"); B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1206 (2nd Cir.1992)(court may consider "financial resources of the parties involved" in making CERCLA allocation). It is undisputed that the Park District is the major provider of open space in the San Francisco East Bay, and that Oyster Bay Regional Park is an important link in a planned trail for hikers, walkers, and cyclists around the Bay. The park, much of which is relatively flat and has paved trails, is also designed to improve open space access to members of the public traditionally less likely to utilize parks in the hills, such as the disabled, the elderly, and the poor. The Park District cannot pass on the cost of remediating the leachate contamination at the site. Thus, if the Park District is required to absorb a substantial portion of this cost, then something "has to give ... either ... at Oyster Bay ... or ... somewhere else in the District." Sutter Tr. at 1151. Given these circumstances, this factor does not support substantially burdening the Park District with remediating hazardous waste occasioned by operation of the landfill.

### (7) Conclusion

As discussed above, the Court begins with the premise that the party legally responsible for the creation and operation of the landfill for almost 40 years should shoulder primary responsibility for closing the site in an effective manner so as to ensure that leachate "shall not be discharged to waters of the State." Def.'s

---

**28.** As the Park District was aware, the Water Board may name both a former and current owner as responsible parties to an order, but consider one party to be primarily liable and the other only secondarily liable.

Exh. 137. Having carefully considered the entire history of the site, and the equitable factors discussed herein, the Court is amply satisfied that the equities and circumstances of this case do not justify shifting this responsibility to the Park District in any significant way. The Court is cognizant, however, that the Park District does benefit from ownership of the site, and that maintenance related issues likely made a minor contribution to the current problems.

Courts have remarked that the task of allocating liability in a CERCLA contribution "escapes any degree of precision," *Browning Ferris,* 13 F.Supp.2d at 781, and this case is no exception. Nonetheless, exercising its discretion as it must, and considering the entire record herein, and all of the above, this Court concludes that principles of equity dictate that the Park District should be allocated five percent liability for past and future response costs incurred at the site.

B. *Recovery of Response Costs under 42 U.S.C. § 9607(a)(4)(B)*

*(1) Introduction*

As noted above, both WMAC and the Park District seek recovery from the other of costs already incurred, according to each party's allocated share of responsibility. These costs include WMAC's emergency response to the seeps in 1995 (i.e. the immediate improvements to the levee and preliminary seep investigation), the winter re-circulation projects for the years 1995–98, RUST's 1996 Remedial Investigation and Feasibility Study, and activities related to the design, construction, and implementation of the leachate management control system currently being implemented at the site. In turn, the Park District seeks to recover funds expended in connection with its 1996–97 levee repair and leachate conveyance system piping project.

■ CERCLA permits private parties to recover, from another responsible party, costs incurred in cleaning up hazardous waste sites but only where the costs were both (1) necessary and (2) consistent with the National Contingency Plan ("NCP"). 42 U.S.C. § 9607(a)(4)(B); *Farmland Indus., Inc. v. Morrison–Quirk Grain Corp.,* 54 F.3d 478, 481 (8th Cir.1995) ("NCP compliance is a prerequisite for recovery of response costs under CERCLA."). The burden of proof on these issues lies with the private party seeking recovery of its costs. *See Cadillac Fairview/Cal., Inc. v. Dow Chem. Co.,* 840 F.2d 691, 695 (9th Cir.1988); *Ambrogi v. Gould, Inc.,* 750 F.Supp. 1233, 1239 (M.D.Pa.1990).

■ With respect to the necessity requirement, courts will deny recovery where the costs incurred were duplicative of other costs, wasteful, or otherwise unnecessary to address the hazardous substances at issue. *See e.g. Lansford–Coaldale Joint Water Authority v. Tonolli Corp.,* 4 F.3d 1209, 1219 (3rd. Cir.1993); *United States v. Iron Mountain Mines, Inc.,* 987 F.Supp. 1263, 1272 (E.D.Cal. 1997); *Northwestern Mut. Life Ins. Co. v. Atlantic Research Corp.,* 847 F.Supp. 389, 401 (E.D.Va.1994); *Central Me. Power Co. v. F.J. O'Connor Co.,* 838 F.Supp. 641, 648–49 (D.Me.1993).

With respect to the consistency requirement, courts look to the NCP, which governs actions taken to address actual or threatened releases of hazardous substances. *See* 40 C.F.R. Part 300. Promulgated by the Environmental Protection Agency ("EPA"), the NCP, *inter alia,* delineates specific steps for private parties to follow in undertaking a hazardous waste clean-up and selecting a remedial course of action. *Id.* Overall, it is "designed to make the party seeking response costs choose a

cost-effective course of action to protect public health and the environment." *Washington State Dep't. of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793, 802 (9th Cir.1995).

Prior to 1990, private parties were required to strictly comply with NCP requirements in order to recover costs under CERCLA. EPA relaxed this standard in 1990, however, by providing that a private party response action is "consistent" with the NCP if the action "when evaluated as a whole, is in substantial compliance with the applicable requirements . . . and results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i); *Central Me. Co. v. F.J. O'Connor Co.*, 838 F.Supp. at 648. Under the "substantial compliance" standard, "immaterial or insubstantial deviations" no longer defeat a cost recovery action. 40 C.F.R. § 300.700(c)(4); *see also Louisiana–Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1576 (9th Cir.1994)("strict compliance" is not required); 55 Fed.Reg. 8666, 8794 ("minor procedural discrepancies [should not] defeat reimbursement . . . ."). EPA purposely shifted to this more flexible "case-by-case" standard to avoid discouraging private parties from cleaning up hazardous wastes for fear that recovery of their costs would later be precluded by less than perfect compliance with the NCP. 55 Fed.Reg. at 8792–94. At the same time, EPA emphasized that it is important to establish enforceable standards against which to measure cleanups that qualify for cost recovery under CERCLA, "so that only CERCLA-quality cleanups are encouraged." 55 Fed.Reg. at 8793. The current "substantial compliance" standard is an attempt "to accomplish both of these somewhat divergent goals." 55 Fed.Reg. at 8793.

■ In order to demonstrate a "CERCLA-quality cleanup," the action must satisfy the three basic remedy selection requirements of CERCLA section 121(b): it must (1) be "protective of human health and the environment," (2) utilize "permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable," and (3) be "cost effective." 42 U.S.C. § 9621(b)(1). EPA has also stated that although public participation is not "an explicit requirement in section 121 on remedy selection," that "meaningful public participation" is "integral" to ensuring the proper completion of a CERCLA-quality cleanup. 55 Fed.Reg. at 8793.

WMAC does not dispute that the specific past costs sought by the Park District ($454,233.00 incurred in connection with the 1996–97 levee repair and leachate conveyance system piping project) were necessary and consistent with the NCP, and the record supports such a finding. The Park District, however, contends that the costs sought by WMAC (totaling $4,901,431.86), were inconsistent with the NCP, and, in some respects, unnecessary.

### (2) Consistency with the NCP

■ WMAC has not proven consistency with the NCP, the Park District argues, because (1) it failed to substantially comply with NCP public participation requirements, and (2) its feasibility study failed to substantially comply with NCP requirements for evaluating alternative remedies. Each is addressed in turn.

### (a) Community Relations and Public Comment Requirements

The NCP sets forth specific standards designed to involve the public in decisions affecting the clean up of hazardous sites. 40 C.F.R. § 300.700(c)(6). These standards call for, *inter alia*, development of a community relations plan prior to beginning field work for the remedial investigation. Specifically, the NCP states that the

"lead agency" [29] shall (1) conduct interviews with local officials, community residents, public interest groups, or other affected parties, to solicit their concerns and information needs, and to learn how and when citizens would like to be involved in the remedial process, 40 C.F.R. § 300.430(c)(2)(i), and (2) prepare a community relations plan designed to "[e]nsure the public appropriate opportunities for involvement in a wide variety of site-related decisions, including . . . selection of remedy." 40 C.F.R. § 300.430(c)(2)(ii). The NCP also calls for publication of notice of the proposed remedial plan in a major local newspaper of general circulation, with a 30–day comment period, and the opportunity for a public meeting during the comment period. 40 C.F.R. § 330.430(f)(3).

Given the "substantial compliance" standard, a private party seeking recovery of cleanup costs need not rigidly comply with every detail of subsections 430(c)(2) and (f)(3) to demonstrate consistency with the NCP. A party must, at a minimum, however, provide a meaningful opportunity for public involvement. *See Union Pacific R.R. Co. v. Reilly Indus., Inc.,* 215 F.3d 830, 835 (8th Cir.2000) ("Failure to provide a meaningful opportunity for public participation and comment in the selection of a remedial action at a particular cleanup site is inconsistent with the NCP."); *Pierson Sand & Gravel, Inc. v. Pierson,* 851 F.Supp. 850, 857 (W.D.Mich.1994) (failure to "afford[ ] the public a meaningful opportunity to participate in selection of the appropriate response action" was fundamental defect precluding substantial compliance with NCP); *see also* 55 Fed.Reg. 8793 (failure to provide public hearing by itself should not defeat cost recovery if

public was otherwise afforded "an *ample* opportunity for comment") (emphasis added). Indeed, as EPA has emphasized, "[p]ublic participation is an *important component* of a CERCLA-quality cleanup, and of consistency with the NCP . . . [P]roviding public participation opportunities should be a *condition for* cost recovery under CERCLA." 55 Fed.Reg. 8795 (emphasis added); *see also* 55 Fed.Reg. 8793 ("meaningful public participation" is integral to CERCLA-quality cleanup).

In this case, there is no doubt that WMAC failed to provide a meaningful opportunity for public participation in the clean-up decisions affecting the site. First, WMAC did not attempt any type of community outreach; nor did it ever develop, much less implement, any community relations plan at any point, much less prior to beginning field work for the remedial investigation. While WMAC maintains a written "good neighbor policy," it did not utilize this policy to involve the community in this instance.

Second, while WMAC published one public notice, it appears to have been purposely designed to discourage, rather than invite, meaningful public participation. The notice (published in the Hayward Daily Review, a small, local newspaper), was printed in extremely small, barely readable, single-spaced type, with the non-descriptive heading "Public Notice." Pl.'s Exh. K–18 at P0047576. The text itself was also quite brief, consisting primarily of a one-sentence description of the intended remedy, another sentence identifying alternatives that were considered, a notice of a 30 day deadline for submitting comments, and contact information. Indeed, it is hard to imagine a notice that could be fashioned to attract less attention to itself

---

**29.** The NCP explains that, in private party actions, the actions to be taken by the lead agency are to be taken by the private party. 40 C.F.R. § 300.700(c)(8); *VME Americas, Inc. v. Hein–Werner Corp.,* 946 F.Supp. at 690 n. 5 (E.D.Wis.1996).

than the notice at issue here. When, not surprisingly, WMAC received no comments, it concluded that there was no public interest. Thus, WMAC never held a public meeting to discuss its remedial plan.[30]

The lack of opportunity for meaningful public participation is further evidenced by the timing of the notice, which ran April 25–29, 1999—three years after RUST had recommended the proposed remedy in 1996. By this late date, WMAC was unlikely to seriously reconsider its intended remedy. In short, the totality of WMAC's efforts to involve the general public consist of one, effectively invisible, notice in 1999. Clearly, there was no meaningful opportunity for public participation in the selection of a remedial action in this case.

WMAC argues, however, that its obligation to involve the public should be satisfied by the hearings, meetings and interactions it has had over the years with a variety of government entities or officials, including the Water Board, the Bay Area Air Quality Management District, the Bay Conservation and Development Commission, the Alameda County Health Department, the San Leandro City Council and Redevelopment Agency, the San Leandro POTW, the San Leandro Associate City Planner, and the Park District.[31] While some courts have found that interaction with government agencies can substitute for public comment, *see, e.g., General Electric v. Litton Bus. Sys., Inc.,* 715 F.Supp. 949, 952–54 (W.D.Mo.1989), *aff'd,* 920 F.2d 1415 (8th Cir.1990), the NCP is quite clear

that its public participation standards are directed at participation by members of the general public and the surrounding community, not government bodies. *See, e.g.,* 40 C.F.R. § 300.430(c) (community relations plan); § 300.430(f)(2) (public notice and public meetings); 55 Fed.Reg. at 8795 ("The public—both PRPs [potentially responsible parties] and concerned citizens—have a strong interest in participating in cleanup decisions which may affect them"); *Sherwin–Williams Co. v. City of Hamtramck,* 840 F.Supp. 470, 477 (E.D.Mich. 1993) ("The regulations clearly contemplate participation by the general public .... Using state regulators as a substitute ... is contrary to the letter and the spirit of the regulations."); *see also County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1514 (10th Cir.1991); *Estes v. Scotsman Group, Inc.,* 16 F.Supp.2d 983, 990–91 (C.D.Ill. 1998); *VME Americas, Inc. v. Hein–Werner Corp.,* 946 F.Supp. 683, 690–93 (E.D.Wis.1996). *Alcan–Toyo.,* 904 F.Supp. at 836; *Channel Master Satellite v. JFD Electronics Corp.,* 748 F.Supp. 373, 389–90 (E.D.N.C.1990). Notably, even where the government *itself* is conducting the cleanup, the NCP requires participation by the public. *See Amland Properties,* 711 F.Supp. at 801.

Moreover, even assuming that government involvement could fulfill the public participation requirements in some circumstances, it would not be appropriate to do so here. The governmental involvement in this case was not unusually extensive; nor

---

**30.** Curiously, WMAC states that its "leachate response action has been a *high-profile* project," and the subject of news articles. Pl's Post–Trial Br. at 24 (emphasis in original). This observation, however, only underscores the public interest in the site, and undercuts WMAC's assumption that the lack of response to its "notice" meant there was insufficient public interest to warrant a public meeting.

**31.** As WMAC points out, the Park District did not ask WMAC to reconsider the remedy selected. The Park District is not, however, the public. Nor has WMAC cited to any authority that excuses a CERCLA plaintiff from substantially satisfying the public participation requirements because the defendant acquiesced to the remedy.

did it lead to comparable opportunities for public input. *Cf General Electric,* 715 F.Supp. at 952–54 (where agency held three public meetings to discuss potential remedies). Rather, it involved routine consideration of permits, variances, approvals, and the like. And while some of the governmental interactions involved meetings open to the public (such as San Leandro City Council's consideration of a discharge permit), no one public meeting presented WMAC's proposal as a whole or presented an opportunity for meaningful public input into WMAC's consideration of remedial alternatives.

WMAC also suggests that public participation was unnecessary in this case because the Water Board's 1994 order required installation of a leachate collection and recovery system, and therefore the choice of remedy was limited. While it is true that WMAC was required to install a leachate collection system, it does not follow that WMAC had no choices to make or alternatives to consider in determining its overall leachate management plan. Indeed, the 1996 RUST RI/FS itself identified a number of alternative approaches.

WMAC's failure to provide any meaningful opportunity for public participation was more than a technical or de minimis deviation from the NCP. *See Union Pacific R.R. Co.,* 215 F.3d at 835, 839 (plaintiff failed to "substantially comply" with NCP when it failed to provide meaningful opportunity for public participation); *Pierson Sand & Gravel, Inc. v. Pierson Tp.,* 851 F.Supp. at 857 (same). As such, WMAC has not met is burden of demonstrating that its incurred response costs were "consistent" with the NCP, and thus recoverable under CERCLA.[32]

### (b) Feasibility Study Requirements

■ The Park District also argues that the "feasibility study" portion of 1996 RUST RI/FS, which analyzed alternative remedial options, fails to substantially comply with NCP requirements because it improperly screened out certain options too early and did not adequately compare costs of different alternatives. In light of the Court's conclusion above, however, it need not reach these issues. *See, e.g., City of Oakland v. Nestle U.S.A., Inc.,* No. C98–3963 SC, 2000 WL 1130066, at *5

---

**32.** Response costs fall into two general categories: "removal" actions and "remedial" actions. The former refers to short term or interim responses to immediate threats, while the latter refers to actions directed toward a permanent remedy. 42 U.S.C. §§ 9601(23), (24); 40 C.F.R. § 300.5; *see also Bancamerica Comm. Corp. v. Mosher Steel of Kansas,* 100 F.3d 792, 797, *amended on other grounds,* 103 F.3d 80 (10th Cir.1996). While the parties have focused their arguments on the NCP's public participation requirements for remedial actions, an opportunity for public participation is required regardless of whether an action is characterized as a removal or remedial action. *See* 40 C.F.R. § 300.415(n)(1)-(3) (setting forth "Community relations" requirements for removal actions); *VME Americas, Inc.,* 946 F.Supp. at 690 (no need to distinguish between removal and remedial actions because public participation required for both); *Reynolds Metals Co. v.*

*Arkansas Power & Light Co.,* No. LR–C–95–281, 1997 WL 580361, at *11 (E.D.Ark. July 30, 1997) (same); *Alcan–Toyo,* 904 F.Supp. at 836–37. While the public participation regulations for removal actions vary somewhat from those set forth for remedial actions, WMAC has not argued that it complied with the specific provisions of § 300.415(n). Nor does the record reflect such compliance.

The Court also notes that a number of cases have held that a private party can recover certain preliminary investigatory and monitoring costs without having to prove consistency with the NCP. *See, e.g., City of Toledo v. Beazer Materials & Services, Inc.,* 923 F.Supp. 1001, 1008 (N.D.Ohio 1996), although a few have held otherwise. *See, e.g., Foster v. U.S.,* 922 F.Supp. 642 (D.D.C.1996). WMAC, has not, however, alternatively argued that it is entitled to such costs or specifically identified such costs.

(N.D.Cal. Aug.8, 2000) (since failure to comply with public participation requirements alone is enough to find lack of substantial compliance with NCP, Court did not reach issue of whether RI/FS was consistent with the NCP).[33] For purposes of completeness of the record, however, the Court notes that it would find that the feasibility study is not inconsistent with the NCP. The NCP requires a feasibility study that evaluates alternative remedies pursuant to nine criteria. 40 C.F.R. § 300.430(e). In this case, RUST undertook an extensive feasibility study in 1996. The Court acknowledges that the Park District has raised some legitimate concerns regarding the evaluation of costs [34]— one of the nine criteria—as well as the adequacy of RUST's consideration of a cap retrofit or upgrade as a supplement to a leachate collection and disposal system. It concludes, however, that overall, the feasibility study, while certainly not in perfect

compliance, did "substantially" comply with the applicable requirements set forth in the NCP.[35]

### III.

### CONCLUSION

In light of all of the foregoing, and good cause appearing, the Court hereby enters the following declaration and judgment:

1. Subject to adjustment by the Court based on exceptional circumstances, such as new information neither known to the parties at the time of trial nor within their reasonable contemplation that would warrant a significant change in the allocation, the Court declares that WMAC is responsible for 95 percent, and the Park District 5 percent, of response costs incurred after August 1999 and in the future by either party that can be shown to be both necessary and consistent with the National Contingency Plan.[36]

---

33. Similarly, the Court need not address the Park District's contentions that certain costs are not recoverable because they were not "necessary."

34. The Court specifically rejects, however, the Park District's cost argument regarding its bay mud program. The Park District's 1977 Land Use Development Plan for Oyster Bay Regional Park calls for the placement of 75 acres of bay mud on the site to facilitate the establishment of lawn areas and tree planting (which require additional irrigation, the effects of which the bay mud is intended to offset). Of these 75 acres, the Park District has already placed mud on 36 acres. The Park District complains that RUST failed to account for the cost of this bay mud in making its cost evaluations. This expense, however, is not a recoverable cost under CERCLA because the Park District's bay mud program was not intended as a response action, but a park development project. Under these circumstances, the failure to "cost-out" the bay mud does not justify finding a lack of substantial compliance with the NCP. The Court also notes that the Park District has so far been able to obtain bay mud at no cost, albeit slowly, over the years through an "opportuni-

ty fill" program. As such, it is difficult to speculate at this time what costs, if any, the Park District would incur in completing its bay mud program.

35. As WMAC notes, supplemental capping remedies could be considered and employed in the future if they are determined to be a cost-effective means of minimizing the amount of leachate that needs to be pumped and treated to maintain the inward gradient. See 40 C.F.R. § 300.430(f)(4)(ii) (requiring review of remedy every five years if remedial action selected results in contaminants remaining at the site above levels that allow for unlimited use and unrestricted exposure).

36. The Park District argued that it should be able to satisfy its percentage share of future response costs (if any) at least in part through the future placement of bay mud on the site by the Park District at a rate of .54% per acre. Although the placement of bay mud on the site should help reduce infiltration and accumulation of leachate, it is clear, as noted above, that the Park District's plans to place a total of 75 acres of bay mud date back to its 1977 plans to develop the park and thus do

2. WMAC has not met its burden of demonstrating that its response costs incurred up through August 1999 are consistent with the NCP for the reasons set forth above and therefore may not recover the Park District's 5 percent share.

3. The Park District has met its burden of demonstrating that it incurred response costs in the amount of $452,233 that were necessary and consistent with the National Contingency Plan. Accordingly, judgment is entered in favor of the Park District in the amount of $429,621.35 payable within 30 days of the date of this Order.

4. In order to reduce the occurrence of disputes concerning the effect of the foregoing declaration, it shall be a condition of recovery of incurred costs, pursuant to the declaration set forth above, that:

(a) the incurring party establish, by agreement with the other party, or by application to this Court if agreement is not possible despite *good faith* efforts, procedures providing for the other party's review of and concurrence in, prior to performance, any response activity that the incurring party contends is within the scope of the foregoing declaration, and

(b) the incurring party shall allow the other party full rights of audit with respect to all costs for which the incurring party seeks reimbursement pursuant to this declaration, and shall include in all contracts for the performance of such response actions a provision affording the other party full rights of audit of each contractor's account.

5. The Court shall retain jurisdiction over this matter to resolve any disputes regarding compliance with this ruling.

**IT IS SO ORDERED.**

---

not constitute a response action. The Court also notes that placement of bay mud is not identified as part of the remedy in the Record of Decision and the Park District did not object to this omission. Accordingly, it is not appropriate for the Park District to receive "credit" for the placement of mud for purposes of future allocation of response costs.

Similarly, the Court rejects the Park District's contention that maintenance of the existing cap constitutes a response cost that should be subject to the above allocation. Routine maintenance of the original cap (which must occur regardless of the need for any response action at the site), is not part of the remedial action at the site. *Cf. United States v. Alliedsignal, Inc.,* 62 F.Supp.2d 713, 721 (N.D.N.Y.1999) (response cost includes cost of maintaining *remedial action* taken).